UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff/Respondent,

       CASE NO. 2:12-CR-20523
v.        2:14-CV-11592
       JUDGE PAUL D. BORMAN
ABDIQANI OSMAN HASSAN,        MAGISTRATE JUDGE PAUL J. KOMIVES

       Defendant/Movant.
_____/

**REPORT AND RECOMMENDATION**

I.    RECOMMENDATION: The Court should deny defendant's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255, and should deny defendant a certificate of appealability.

II.    REPORT:

A.    *Background*

Defendant/movant Abdiqani Osman Hassan is a federal prisoner, currently confined at the McDowell Federal Correctional Institution in Welch, West Virginia. On August 9, 2012, defendant was charged in a three-count Indictment filed in this Court with: (1) fraudulent possession and use of a permanent resident card, 18 U.S.C. § 1546(a); (2) identification documents fraud, 18 U.S.C. § 1028(a)(6); and (3) aggravated identity theft, 18 U.S.C. § 1028A. On October 18, 2012, following a jury trial, defendant was convicted of all three counts. The evidence underlying defendant's conviction was summarized by the Sixth Circuit on defendant's direct appeal:

> Hassan was born in Somalia in 1986, moved to Kenya in 1990, and entered the United States in 2005 as a refugee. He wanted to drive to Canada, but he needed a "Permanent Resident Card" or "green card." Although Hassan had previously applied for one, the United States had denied his application. Hassan and a friend,

Abdihakim Jama, drove to Michigan, where they stayed for two days at a hotel outside of Detroit. Then, early in the morning on May 3, 2012, Hassan and Jama drove to Canada over the Ambassador Bridge that connects Detroit with Windsor, Ontario.

At the U.S.-Canada border, Canadian Border Services Agency officers intercepted Hassan and Jama and escorted them back from the border to U.S. Customs offices on the U.S. side of the Ambassador Bridge. At the subsequent jury trial, Blake Bradley, an admissibility officer with U.S. Customs and Border Protection ("CBP"), testified that the Canadian officers gave him a green card in the name of Mahad Farah. Officer Bradley asked Hassan if the card belonged to him, and Hassan admitted that it did not and that he wanted to enter Canada with it. Officer Bradley testified:

> A. I asked Mr. Hassan was that him on the card I was holding.
> Q. What response did you receive?
> A. Said it was not me.
> Q. Did he say anything else?
> A. Yes. He had told me that the government had told him that he had to leave the United States, and he said that he wanted to try to enter and move into Canada with this card and if he could not move to Canada with it, then he would–wanted to be deported back home.

R. 30 at Page ID # 134.

CBP Officer Jeremy Ferguson, an enforcement officer, testified that he received a call from Officer Bradley and went to the Ambassador Bridge in Detroit. Officer Bradley gave him the green card in the name of Farah.

Officers Ferguson and Bradley interviewed Hassan. First, they read Hassan his *Miranda* rights using a written "Warning as to Rights" and "Waiver" form. Hassan signed the form, agreeing that he understood them. Then, still using the form, the officers asked Hassan whether he wished to waive his *Miranda* rights. Hassan said he did, and again, signed the form. Hassan then admitted that he stole the green card from Farah, another friend in Minnesota, and presented it as his own document to Canadian authorities at the checkpoint on the far side of the bridge in an attempt to enter Canada, but was refused entry. The officers typed each of Hassan's answers into a written "Record of Sworn Statement in Administrative Proceedings" form that they printed out, allowed Hassan to review the form for any mistakes, and asked him to initial next to each answer. Hassan agreed–initialing the confession 68 times and signing his full name at the end of it.

As the interview ended, Officer Ferguson continued to investigate the green card. He confirmed from an immigration database that the green card did, in fact, belong to Farah. He also tried to call Farah using a phone number listed in the database. When that number did not work, Hassan provided a different number. Officer Ferguson called it and was able to speak to a person who identified himself as Farah. During trial, the prosecutor asked if Officer Ferguson determined whether the green card had been stolen, but Defendant's hearsay objection was sustained.

> Q. Without telling me what Mr. Farah said, based on your

> conversation with him, did you determine that his green card had been stolen?
> [DEFENSE COUNSEL]: Your Honor—
> A. Yes, I did.
> [DEFENSE COUNSEL]:—I object. The only way he can do that is to introduce hearsay.
> THE COURT: I'll sustain the objection.
> [DEFENSE COUNSEL]: I'd request a limiting instruction with respect—well, there was no answer. I'm sorry.
> THE COURT: Objection sustained. That means it is not evidence before the jury to that question.
>    Please proceed.

R. 30 at Page ID # 119–20.

Testifying in his own defense at trial, Hassan recanted his confession. This time, he claimed that both Farah and Jama had driven to Michigan with him and that he and Jama had decided to cross into Canada. He claimed that he did not know Farah's green card was in the car with them. Instead, he had decided to drive to the border–without any identification documents–so that he could speak with the Canadian authorities about residing in Canada.

Hassan also claimed that after he and Jama pulled up to the booth at the Canadian checkpoint, the Canadian officers searched their car–and that was when they found Farah's green card. Hassan claimed that he never told the Canadian officers that Farah's green card was his own. According to Hassan, as he and Jama crossed back over the bridge, Jama threatened to hurt Hassan's kids if Hassan did not admit to using Farah's green card.

On cross-examination, Hassan admitted that he had previously been convicted of using his brother's green card to enter Canada. Hassan also admitted that he had been convicted of first-degree burglary in 2011. And Hassan admitted that he was involved with a Somali street gang in Minnesota–although he claimed that he was only participating to assist the FBI. Furthermore, unlike on direct examination, Hassan claimed that he had actually brought copies of his driver's license and immigration papers with him to the Ambassador Bridge. But, according to him, the Canadian officers never found those documents because they were only copies.

Near the end of Hassan's cross-examination, the prosecutor asked the following question about Officer Ferguson's phone call with Farah:

> Q. How can you explain the fact that when Officer Ferguson made contact with you and started doing some checking, he contacted Mr. Farah who was actually at work in Minnesota?

R. 30 at Page ID # 185. Defense counsel objected on the ground that the question assumed facts not in evidence. After the district court directed the prosecutor to rephrase the question, the prosecutor asked:

> Q. Can you explain how it is that Mr. Farah was working in

3

> Minnesota when he was contacted by Officer Ferguson?

R. 30 at Page ID # 187. The defense attorney again objected, and the trial court this time explained,

> Well, I overruled the objection. I think there was some testimony relating to a phone call and a phone number.

R. 30 at Page ID # 187. The cross-examination continued without objection:

> Q. Can you answer that question?
> A. Yes, I can answer that question. That was a lie because in the statement the phone number that I gave Mr. Ferguson, that I said that was my phone number, is the same number that Mr. Ferguson had contacted Mr. Mahad Farah and Mr. Mahad Farah who was, in fact, in a hotel here in Michigan called Victory Inn.
> Q. Why would Mr. Farah lie he didn't know anybody had his ID? He wasn't in any trouble.
> A. He knew everything.
> Q. He knew that you'd been given his ID to go to Canada?
> A. No, he did not know that, but he knew me and Mr. Jama was traveling to Canada.

R. 30 at Page ID # 187–88.

*United States v. Hassan*, 552 Fed. Appx. 527, 528-31 (6th Cir. 2014). On April 23, 2013, the Court sentenced defendant to concurrent terms of 18 months' imprisonment each on Counts 1 and 2, and to a consecutive term of 24 months' imprisonment on Count 3, for a total term of 42 months' imprisonment. Defendant, through counsel, appealed to the United States Court of Appeals for the Sixth Circuit, asserting claims of insufficient evidence and prosecutorial misconduct. The Sixth Circuit rejected defendant's claims and affirmed his convictions. *See Hassan*, 552 Fed. Appx. at 531-33.

The matter is currently before the Court on defendant's motion to vacate, correct, or set aside his sentence pursuant to 28 U.S.C. § 2255, filed on April 21, 2014. As grounds for relied, defendant contends that his trial counsel was ineffective for failing to investigate and call favorable witnesses. The Government filed a response to the motion on July 8, 2014.

B.   *Legal Standard*

The substantive provisions of § 2255, which were not altered by the Antiterrorism and Effective Death Penalty Act of 1996, provide that a federal prisoner "claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . may move the court which imposed the sentence to vacate, set aside, or correct the sentence." 28 U.S.C. § 2255 para. 1. Thus, a defendant may be entitled to § 2255 relief if his conviction or sentence violates either the Constitution or a federal statute. Here, all of defendant's claims assert that counsel rendered constitutionally inadequate assistance in failing to investigate and call witnesses.

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id*. at 687. These two components are mixed questions of law and fact. *Id*. at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.* With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id*. at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize

5

that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690.  With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.  It is defendant's burden to establish the elements of his ineffective assistance of counsel claim.  *See United States v. Pierce*, 63 F.3d 818, 833 (6th Cir. 1995); *Lewis v. Alexander*, 11 F.3d 1349, 1352 (6th Cir. 1993) (same).

As the Supreme Court has recently explained, *Strickland* establishes a high burden that is difficult to meet:

> "Surmounting Strickland's high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. ----, ----, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689-690, 104 S.Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689, 104 S.Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052.

*Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).

C.   *Discussion*

Defendant contends that counsel was ineffective for failing to conduct an adequate investigation and for failing to interview and call at trial two witnesses.  Specifically, he contends

that counsel should have: (1) contacted the hotel that he stayed at in Ann Arbor to see if they had any videotapes, which would prove that Farah was with him in Michigan, not in Minnesota as testified to by Ferguson; (2) contacted Canadian customs officials and obtained any paperwork relating to their refusal to allow him to enter Canada; (3) investigate phone calls made between him and Farah while he was detained in the St. Clair County Jail; and (4) call at trail both Farah and Jama. The Court should conclude that defendant is not entitled to relief on these claims.

As noted above, "it is [defendant]'s burden to establish the elements of his ineffective assistance of counsel claim." *Pierce*, 63 F.3d at 833. In particular, "defendant must 'affirmatively prove prejudice.'" *Hodge v. Haeberlin*, 579 F.3d 627, 639 (6th Cir. 2009) (quoting *Strickland*, 466 U.S. at 693). Thus, "[a] defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989); *see also*, *Wright v. Gramley*, 125 F.3d 1038, 1044 (7th Cir. 1997) ("[I]n order to succeed on a failure to investigate claim, the petitioner must demonstrate what the attorney would have discovered had a proper investigation occurred, as well as what evidence would have been introduced at trial."). Similarly, "a *Strickland* claim based on counsel's failure to investigate a potential witness requires a specific, affirmative showing of what the missing witness's testimony would be, and this typically requires an affidavit from the overlooked witness." *Thompkins v. Pfister*, 698 F.3d 976, 987 (7th Cir. 2012); *see also*, *Wolfe v. Bock*, 412 F. Supp. 2d 657, 678 (E.D. Mich. 2006) (Lawson, J.); *cf. Hodge*, 579 F.3d at 639.

Here, petitioner has not presented any evidence as to what further investigation may have uncovered or what the witnesses would have testified to had they been called at trial. Nor has he

7

explained how the missing evidence or witnesses would have created a reasonable probability of a different result. With respect to the hotel videos, there is no evidence that any such videos existed, or if they did that they would have shown Farah to have been in Michigan at the time he spoke on the phone to Ferguson. Nor has defendant explained how the alleged phone calls between him and Farah while he was detained at the St. Clair County Jail, or the Canadian customs records, would have provided any defense to the charges. With respect to the customs records in particular, the evidence adduced at trial established that the Canadian officials "intercepted Hassan and Jama and escorted them back from the border to U.S. Customs offices," and that they gave Bradley Farah's green card. *Hassan*, 552 Fed. Appx. at 529. With respect to the testimony of Jama and Farah, defendant has not made any suggestion, much less an offer of proof, as to what these witnesses would have said if called to testify at trial. And it is doubtful that they would have testified favorably to defendant. The only evidence in the record with respect to Farah indicates that he told Ferguson that his green card had been stolen and that he would cooperate in any way possible. And it is doubtful that Jama would have confirmed defendant's account that Jama threatened defendant's family. Moreover, even had all this evidence been uncovered, it would not have created a reasonable probability of a different result. At most, the evidence identified by defendant may have had some limited impeachment value, but this value would still have been substantially outweighed by the evidence against defendant. Most notably, defendant gave a detailed, written statement admitting that he stole the green card from Farah and used it to attempt to enter Canada, initialing his response to each question (68 times in total) and signing the statement at the end. Although defendant attempted to recant this confession at trial, his trial testimony was substantially impeached by inconsistencies in his testimony and his prior convictions. Thus, "even if counsel's conduct was

8

arguably deficient, in light of the overwhelming evidence of guilt, [defendant] cannot establish prejudice." *Allen v. Woodford*, 395 F.3d 979, 999 (9th Cir. 2005).

Nor is petitioner entitled to an evidentiary hearing to develop evidence in support of his ineffective assistance claims. Although the Court has discretion to order an evidentiary hearing where one is required to dispose of the defendant's claims, *see* Rule 8, Rules Governing Section 2255 Proceedings in the United States District Courts, 28 U.S.C. foll. § 2255, the Court "need not hold a hearing in every case where the petitioner makes factual allegations." *Patel v. United States*, 19 F.3d 1231, 1235 (7th Cir. 1994). Speculative allegations or allegations which are contradicted by the record are insufficient to entitle a petitioner (or a defendant in a § 2255 proceeding) to an evidentiary hearing, *see Getsy v. Mitchell*, 495 F.3d 295, 312 (6th Cir. 2007); *Young v. Herring*, 938 F.2d 543, 560 & n.12 (5th Cir. 1991). Specifically, "'bald assertions and conclusory allegations do not provide sufficient ground to warrant requiring . . . an evidentiary hearing.'" *Washington v. Renico*, 455 F.3d 722, 733 (6th Cir. 2006) (quoting *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001)). Here, as noted above, defendant had failed to provide any indication that an evidentiary hearing could develop evidence that would support his ineffective assistance claims. *See United States v. Bass*, 460 F.3d 830, 839 (6th Cir. 2006) (in context of motion for new trial, district court did not abuse its discretion in failing to hold evidentiary hearing on ineffective assistance claim based on failure to call witnesses where defendant "failed to point to any evidence (e.g. affidavits) . . . of what the witnesses would testify to."). Accordingly, the Court should conclude that petitioner is not entitled to an evidentiary hearing.

D.     *Recommendation Regarding Certificate of Appealability*

     1.     *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a defendant may not appeal a denial of motion to vacate unless a judge issues a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000). Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the movanat is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84. Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable." *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2255 Proceedings for the United States District Courts, 28 U.S.C. foll. § 2255, provides that "[t]he district

10

court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue." FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory committee note, 2009 amendments. In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

    2.    *Analysis*

If the Court accepts my recommendation regarding the merits of defendant's motion, the Court should likewise deny a certificate of appealability. As explained above, defendant has failed to point to any evidence which would meet his burden of demonstrating that he was prejudiced by counsel's alleged failure to investigate or call witnesses. Thus, it is not reasonably debatable that defendant has failed to establish that counsel was ineffective under *Strickland*. Accordingly, the Court should deny defendant a certificate of appealability.

E.    *Conclusion*

In view of the foregoing, the Court should conclude that defendant's ineffective assistance of counsel claims are meritless. Accordingly, the Court should deny defendant's motion to vacate his sentence 28 U.S.C. § 2255. If the Court accepts this recommendation, the Court should also deny defendant a certificate of appealability.

III.    <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>:

      The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

      Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: September 10, 2014        s/ Paul J. Komives
                                          PAUL J. KOMIVES
                                          UNITED STATES MAGISTRATE JUDGE


I hereby certify that a copy of the foregoing document was sent to parties of record on September 10, 2014, electronically and/or by U.S. Mail.

                                          s/Michael Williams
                                          Case Manager for the
                                          Honorable Paul J. Komives